Allstate Insurance Company, Plaintiff-Appellee, v. Stephan Urban, Tony DeSanto, and Robert Urban, d/b/a Highland Bump Shop, Lois Davis, individually and as Executor of Estate of Harold W. Davis, Deceased, Defendants, and Century Indemnity Company, Defendant-Appellant.

Gen. No. 11,054.

Second District, Second Division.
November 22, 1957.
Rehearing denied December 31, 1957.
Released for publication December 31, 1957.

Peterson, Lowry, Rall, Barber & Ross, of Chicago (A. R. Peterson, Harold W. Huff, and Herbert C. Loth, Jr., of counsel) for defendant-appellant.

Snyder, Clarke & Dalziel, of Waukegan, for Allstate Insurance Company, plaintiff-appellee, and Sidney H. Block and Glenn K. Seidenfeld, of Waukegan, for Lois Davis, etc., defendant-appellee (Daniel J. Dalziel and Glenn K. Seidenfeld, of counsel).

PRESIDING JUSTICE CROW delivered the opinion of the court.

The plaintiff, The Allstate Insurance Company, filed a declaratory judgment action against the defendant Century Indemnity Company, the defendant Stephan

Urban, the defendants Tony DeSanto and Robert Urban, d/b/a Highland Bump Shop, and the defendant Lois Davis, individually, and as Executor of the Estate of Harold W. Davis, deceased, for a judicial declaration that the plaintiff's liability under an automobile liability insurance policy issued by it to the defendant Stephan Urban on his 1950 Chevrolet is secondary and excess, and that the defendant Century Indemnity Company is primarily liable under a garage liability insurance policy issued by it to the defendants Tony DeSanto and Robert Urban, d/b/a Highland Bump Shop, for the alleged tortious act of the defendant Stephan Urban while driving a 1949 Mercury which resulted, August 22, 1954, in injuries to the defendant Lois Davis, individually, and in the alleged wrongful death of her decedent, Harold W. Davis. The action was tried without a jury. During the course of the suit the defendant Stephan Urban, and the defendants Tony DeSanto and Robert Urban, d/b/a Highland Bump Shop were dismissed. The defendant Century Indemnity Company answered, and, we gather, the defendant Lois Davis, etc. answered. In any event no questions are raised on the pleadings and the real controversy here is between the plaintiff insurer, The Allstate, and the defendant insurer, Century.

The court at first found the issues in favor of the defendant, Century Indemnity Company, and declared and adjudged it was not the primary insurer of Stephan Urban. A post trial motion of the plaintiff for judgment notwithstanding the finding was granted, however, and a final judgment was entered declaring that Stephan Urban was covered by the garage liability policy issued by the defendant Century to the Highland Bump Shop, and that such coverage was primary, and that the coverage of the plaintiff, The Allstate's, automobile liability insurance policy was excess or secondary. The court further found in its

388

final order that at the time of the collision between the 1949 Mercury in charge of Robert Urban and Tony DeSanto, d/b/a Highland Bump Shop, and operated by Stephan Urban, and the motor vehicle operated by Harold W. Davis, Stephan Urban was using the 1949 Mercury with the permission of and as one of the customers of Robert Urban and Tony DeSanto, d/b/a Highland Bump Shop, and that its use by him was in direct connection with the business operation of the Highland Bump Shop, being in accordance with a common custom and usage of such business in building good will and maintaining satisfactory customer relationships and that such use was such as to create coverage of Stephan Urban by the defendant Century under its garage liability policy issued to Anthony DeSanto and Robert Urban, d/b/a Highland Bump Shop.

The defendant Century Indemnity Company appeals from that final judgment, urging that its garage liability policy issued to the Highland Bump Shop was a limited policy, which would have provided coverage for Stephan Urban only in the event that Stephan Urban had been using the borrowed automobile at the time of the accident for a business purpose connected with the repair shop operations of the named insured, Highland Bump Shop; that the uncontradicted evidence shows that Stephan Urban was on a pleasure mission of his own at the time of the accident, and, therefore, the trial court erred in finding that the Century Indemnity Company policy covered the liability of Stephan Urban.

The theory of the plaintiff The Allstate Insurance Company (and the defendant Lois Davis etc.) is that the 1949 Mercury operated by Stephan Urban was in the charge and possession of the Highland Bump Shop, was loaned to Stephan Urban as a substitute vehicle while his 1950 Chevrolet was undergoing repairs at the

389

Highland Bump Shop, in accordance with the usual custom of the business, that both the 1949 Mercury and its operator Stephan Urban were thereby brought under the garage liability insurance policy of Century, and that the plaintiff The Allstate under its automobile liability insurance policy on Stephan Urban's 1950 Chevrolet thereby became an excess or secondary insurance carrier.

Stephan Urban owned a 1950 Chevrolet automobile, which at the material times in 1954 was insured with the plaintiff, The Allstate Insurance Company, under an automobile liability policy. That policy provided, inter alia, that:

". . . 'Substitute automobile' means an automobile not owned by the named insured but temporarily used as the substitute for the owned automobile while withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction." . . . "With respect to a substitute automobile . . . Coverages A and B shall be excess insurance over any other collectible liability insurance of any kind available to the insured, . . . ."

There is no dispute as to the 1949 Mercury being a "substitute automobile" under that policy and as to the liability of The Allstate thereunder, but its argument is that, under the circumstances, the insurance of the defendant Century under its garage liability policy is "other collectible liability insurance—available to the insured," Stephan Urban, and, hence, under the circumstances, the coverage under The Allstate policy is "excess insurance" over the coverage under the Century policy.

Robert Urban and Tony DeSanto were partners and proprietors of the Highland Bump Shop. They had had the 1950 Chevrolet at the shop, it apparently having been left there by the prior owner, in a wrecked or damaged condition. Stephan Urban, Robert's father,

gave him some money to buy it; DeSanto acquired it and an endorsed certificate of title from the prior owner; he delivered that certificate to Stephan, who later obtained a certificate of title in his name; Stephan gave Robert some more money for certain parts, which he acquired; Robert was doing the repair work on it himself mostly in the late afternoons or Saturday afternoons, without charge for the labor; the money for the purchase of the car and parts went through the firm's books; DeSanto knew what Robert was doing.

While his Chevrolet automobile, so acquired, was undergoing such repairs August 22, 1954 and for a while before then at the Highland Bump Shop, at Highland Park, Stephan Urban drove, for a time, a 1949 Mercury automobile which had been loaned him by the Highland Bump Shop. The shop had previously let him use a truck belonging to it, and then one day when he had stopped to see if his Chevrolet was ready they told him about the 1949 Mercury, which they said he could use until his Chevrolet was ready, and the Mercury was turned over to him in place of the truck. He had used the Mercury for about a week before the accident in question, for his own purposes. The 1949 Mercury was not owned by the Highland Bump Shop, but had previously been left with the shop in May by a woman owner who lived in Highland Park, with the understanding that the shop would perform some body repairs and repainting on it while she was traveling in Europe, and that it would be ready for her when she returned in September. That owner of the 1949 Mercury had not given the Highland Bump Shop any authority to loan it to Stephan Urban or anyone else. It was not used as a regular "loaner" by the shop. Robert Urban said that once in a while the proprietors loaned their personal cars and had loaned out their truck a few times.

There was testimony offered by the plaintiff The Allstate Insurance Company to the effect that it is a

common custom and usage in the garage or repair shop business, for the shop to loan another car to a customer while the customer's car is being repaired at the shop, although both of the witnesses on that score said the cars they so loaned were cars they, as proprietors of · the shop, owned themselves. One said he would not loan another customer's car. The other said he had occasionally done so where the other customer had asked him to use the car so the battery would not go dead from being in storage awhile.

On the night of August 21–22, 1954, Stephan Urban, while driving that 1949 Mercury automobile,—his own 1950 Chevrolet being still at the Highland Bump Shop, —was involved in an accident with another car operated by Harold W. Davis, giving rise to suits for the alleged wrongful death of Harold W. Davis and for alleged personal injuries brought by the defendant Lois Davis, individually, and as Executor of her deceased husband's estate. Stephan Urban was on a social mission of his own at the particular time of the accident. The Allstate Insurance Company ultimately agreed to defend Stephan Urban in those suits under appropriate reservations of rights in which it claimed that it was not the primary insurer of Stephan Urban but was only an excess carrier and that Century Indemnity Company was the primary insurer. Century Indemnity Company was notified of the accident and requested to defend the suits, and it took the position that its garage liability policy issued to the Highland Bump Shop did not afford coverage to Stephan Urban, under the circumstances, and declined to defend the suits.

The defendant Century Indemnity Company's Garage Liability Policy issued to Anthony DeSanto, d/b/a Highland Bump Shop, 951 Elm Place, Highland Park, Illinois, in effect at the material times in 1954, provided, in the Declarations, Item 3:

"The insurance afforded is only with respect to such and so many of the following coverages and hazards thereunder as are indicated by specific premium charge or charges. . . ."

The Declarations show that the Highland Bump Shop paid for two of the eight listed possible or available coverages which it might have obtained thereunder. One of the coverages paid for was "A.— Bodily Injury Liability" for Hazard "1. Premises— Operations—Automobiles." The limits of liability for A—Bodily Injury Liability were $25,000 each person and $50,000 each accident, and the limits for B—Property Damage Liability were $10,000 for each accident.

Century agreed "with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the Declarations and subject to the limits of liability, exclusions, conditions and other terms of the policy":

"Insuring Agreements

"1. Coverage A—Bodily Injury Liability.

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the hazards hereinafter defined."

And its insuring agreement as to Coverage B—Property Damage Liability—is similarly worded, and applied to injury to or destruction of property.

The "Definition of Hazards" as to "Division 1— Premises—Operations—Automobiles," being the hazard against which the Highland Bump Shop paid for Coverages A and B liability insurance is as follows:

"The ownership, maintenance or use of the premises for the purpose of an automobile dealer, repair shop, service station, storage garage, or public parking place,

and all operations necessary or incidental thereto; and the ownership, maintenance or use of any automobile in connection with the above defined operations, and the occasional use for other business purposes and the use for non-business purposes of (1) any automobile owned by or in charge of the named insured and used principally in the above defined operations, and (2) any automobile owned by the named insured in connection with the above defined operations for the use of the named insured, a partner therein, an executive officer thereof, or a member of the household of any such person."

Under "III—Definition of Insured" that Century policy also provided:

"With respect to the insurance under coverages A, B . . . the unqualified Word 'insured' includes the named insured and also includes . . . (2) any person while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission . . . ."

And under "Exclusions" that policy provided:

"This policy does not apply . . . (b) to any automobile while rented to others by the named insured, unless to a salesman for use principally in the business of the named insured, . . . ."

The Century Indemnity Company argues that there is only one issue for the Court,—whether under a proper construction of the Century garage liability policy of insurance with the Highland Bump Shop, under the circumstances here involved, it did or did not cover the alleged liability of Stephan Urban at the time of the accident concerned.

Under that policy, the actual use of the 1949 Mercury automobile by Stephan Urban was, so far as the parties to this suit are concerned, unquestionably with

the permission of the named insured, Highland Bump Shop, and hence if that 1949 Mercury was an automobile covered by the policy Stephan Urban was a person included within the meaning of "insured" thereunder, pursuant to III, Definition of Insured.

One of the hazards against liability for which Century insured was the "use of any automobile in connection with the above defined operations,"—i. e., in connection with "the ownership, maintenance or use of the premises for the purpose of an automobile—repair shop—and all operations necessary or incidental thereto," pursuant to the Definition of Hazards. The "automobile" there referred to need not necessarily be one owned by the named insured, Highland Bump Shop. It may be, as here, a 1949 Mercury owned by someone else. It may be, literally, "any automobile." That is what the policy says.

The "use" there referred to need not necessarily be a frequent, regular, long continued, oft repeated use. The policy does not say so. It may be a use on one or more occasions, if it can properly be said to be otherwise a use (permissive, if by someone other than the named insured) in connection with the above defined operations. And if the use be of an automobile not owned by the named insured, Highland Bump Shop, it is of no concern in this present case whether, as between the shop and the owner of the automobile, the shop had or had not any right or authority so to use or permit its use by Stephan Urban, if there is in fact a permissive use thereof in connection with the above defined operations.

Nor, if there be otherwise a permissive use of any automobile in connection with the above defined operations, does the policy say the automobile or the permissive use thereof are excluded or not covered merely because at the particular time of a later accident the operator is on a social mission of his own. That the

operator is at the particular time of a later accident on a social mission of his own does not necessarily and in all events lead to a conclusion that the use of the automobile is not "in connection with the above defined operations." The use may nevertheless be in connection with the above defined operations when all the other material facts and circumstances are considered, and the other material facts and circumstances cannot simply be ignored. In fact, the policy specifically excludes "any automobile while *rented* to others by the named insured" (with an exception not here material), pursuant to the Exclusions,—meaning, as we understand it, automobiles rented to others away from the shop's premises. But it does not exclude, and instead includes, with no additional premium, automobiles temporarily *lent* to customers *without charge* away from the premises while the customer's automobile is being worked on at the named insured's shop: The Fire, Casualty and Surety Bulletins, published by National Underwriter Company, Third Printing, January, 1955, p. Ga.–4 (a publication apparently of one organ of the industry cited by both The Allstate and Century). It does not seem unreasonable to believe that an automobile repair shop's so temporarily loaning an automobile to its customer and so temporarily giving him the permissive user thereof under such circumstances may be in connection with the ownership, maintenance or use of the premises for the purpose of an automobile repair shop, or may be an operation incidental, if not necessary, thereto, and, if so, such use of such automobile is in connection with the above defined operations. And in the normal course of events it would seem that necessarily a customer to whom a shop may so temporarily loan an automobile, without charge, under such circumstances, would thereafter temporarily operate it on personal or social missions of his own, and the named insured and the insurer pre-

sumably know and contemplate that. How else, normally, could such a customer operate it? Had such temporary loaning and such temporary permissive user by a customer been intended to be excluded the insurer could readily have done so in the Exclusions where renting of automobiles is dealt with.

It has been said that the "major effect of the additional interests clause (III, Definition of Insured) is that the garage liability policy covers, without additional charge, the personal liability of . . . customers . . . for driving of automobiles covered by the policy . . . It is, of course, not restricted to such cases, but these are the most common," and that "The additional interests clause is very broad. Protection is not restricted to accidents arising out of garage business": The Fire, Casualty and Surety Bulletins, supra, Sixth Printing, August, 1953, p. Ga.–6. The authors thereof at that point refer to Aetna Casualty and Surety Co. v. Buckeye Union Casualty Co. (1952) 157 Ohio St. 385, 105 N.E.2d 568, which we shall later discuss, and summarize it by saying: "if the customer or prospect has liability . . . insurance on his automobile under standard conditions and is involved in an accident while driving a garage automobile, the garage liability policy is primary coverage and the customer's insurance would be liable only as excess coverage." We do not understand, however, the authors of The Fire etc. Bulletins to be of the opinion the basic principle of Aetna v. Buckeye is limited necessarily only to cases where the garage *owns* the automobile it lends its customer, although that, of course, was the fact in Aetna v. Buckeye, or that the authors mean to limit only to cases where the garage so *owns* the auto it lends its customer their immediately preceding comments on the major effect of the additional interests clause, the very broad character thereof, and that protection thereunder is not restricted to accidents arising out of

397

garage business. "Any automobile" in the policy here concerned, at least, can mean only what it says,—"any automobile."

In a case of this type two important factors to be borne in mind are the particular provisions of the particular insurance policy involved, and the facts of the particular case; decisions in other cases are not particularly persuasive or helpful unless both the particular provisions of the policy and the facts are the same or substantially the same: Hardware Mut. Casualty Co. v. Wendlinger (1944) 146 F.2d 984. Many of the cases cited in the able briefs of both The Allstate and Century do not involve the same type of policy,— a garage liability policy,—as is here involved, or the same or substantially same policy provisions, or the same or substantially same facts, and although we have considered them they are believed to be inapplicable here and need not be discussed in detail. We shall refer only to those involving a garage liability type of policy, but even in these the policy provisions and the facts were variant to a greater or lesser extent from those of the present case.

In Aetna Casualty and Surety Co. v. Buckeye Union Casualty Co. (1952) 157 Ohio St. 385, 105 N.E.2d 568, cited by the plaintiff The Allstate, the Aetna Casualty had issued an automobile liability insurance policy to one Butler on his Chevrolet, which also applied to a substitute automobile temporarily used while his Chevrolet was being repaired, but as to such temporary use of a substitute automobile the Aetna insurance was excess insurance over any other insurance available to the insured. Butler, a regular customer of Weaver Motor Company, took his Chevrolet there to be repaired. Weaver Motor Company loaned Butler its own 1940 Chevrolet to use until the repairs on Butler's car were completed. While so using the Weaver loaned car Butler had an accident with one Gibbs under circum-

stances indicating Butler probably was liable. Although it does not specifically appear from the opinion, we obtain the impression that Butler at the particular time of the accident was on a personal mission of his own. Buckeye Union Casualty Co. had issued a garage liability policy to the Weaver Company, which covered it and also covered its customers "while any such customer is using, for purposes of demonstration or otherwise in direct connection with such business operations, any automobile covered." Aetna made a settlement with Gibbs, and paid certain money, and then sued Buckeye to recover, claiming Buckeye was the primary insurer and Aetna the excess or secondary insurer under the circumstances. Buckeye urged Butler was using the Weaver borrowed automobile for his own purposes, not in direct connection with the business operations of Weaver. The trial court found that at the time of the collision Butler was using the borrowed automobile with Weaver's permission and as one of its customers in direct connection with its business operations, in furtherance of building up its business through good will and maintenance of satisfactory customer relationships, that the Buckeye policy covered Butler, and was primary, and the Aetna insurance was secondary, but also held Aetna was a volunteer in making its payment and could not recover, and entered judgment for Buckeye. The Court of Appeals affirmed. The Supreme Court of Ohio reversed and entered a judgment for Aetna,—agreeing with the lower courts that Butler's use of the automobile created coverage under the Buckeye policy, that such was primary, and that the Aetna policy was secondary,— but holding that Aetna was not a mere volunteer and could recover from Buckeye. The Court said, p. 571:

"As appears from the foregoing statement of facts both lower courts agreed upon the important fact that Butler's use of the Weaver Motor Company automobile

399

was such as to create coverage of Butler by the Buckeye policy. The lower courts also agreed on the legal construction of the two policies, to-wit, that the coverage of the Buckeye policy was primary and that of the Aetna policy was secondary. With that construction of the policies this court agrees."

In Coffey, exec. v. Gayton (1939) 136 Me. 141, cited by the defendant Century, one Gayton was president and manager of Gayton-Crowley Chevrolet Inc., a sales and garage business. In connection with his business Gayton rode with one Curtis in Curtis' car to another city to interview a prospective customer. On their way they met a Miss Bicknell, an acquaintance, driving her car. At their invitation she left her car at a nearby town and got in with them for the ride. Later in the day on the return trip when they got to where Miss Bicknell had left her car she did not want to drive back herself in traffic after dark. So Gayton got in her car, and started to drive it back. While in her car he had an accident with one Coffey's car. Coffey et al. later recovered judgments against Gayton and Miss Bicknell. She had auto insurance in Travelers Ins. Co. Gayton-Crowley Chevrolet Inc. evidently had a garage liability policy with Merchants Mutual Casualty Co., which, inter alia, covered the "operation of any . . . automobile . . . for any and all. purposes in connection with such business including pleasure use," and also covered "the legal liability as defined therein of H. N. Gayton, Pres., while any automobile . . . in charge of the named garage . . . is being operated by said named person . . . for the purposes described in the policy and for private pleasure purposes." A bill in equity to reach the insurance to apply on the judgments was dismissed as to Merchants and sustained as to Travelers and the other defendants. The Court held the Bicknell car at the time of the accident was not in charge of Gayton-Crowley Chevrolet

400

Inc., and was not being operated for any purpose in connection with the business of that company, and that Gayton's offer to drive the Bicknell car was solely as a favor to Bicknell.

In Hardware Mut. Casualty Co. v. Wendlinger, supra, cited by both The Allstate and Century but chiefly by Century, Hardware Mutual Casualty Co. had issued a garage liability policy to J. W. Ramsey and Duncan Barbee d/b/a Ramsey and Barbee, Auburn, Illinois, which, inter alia, provided it covered "the ownership, maintenance or use of any automobile for any purpose in connection with the above defined operations, and also for pleasure use"; it excluded "the ownership, maintenance or use for pleasure purposes of any automobile not owned by or in charge of the named insured for use principally in such operations"; it covered any partner as an insured if he was active in the declared operations; it covered any other person as an insured "only with respect to the use, for such business operations or for pleasure purposes of any automobile covered under such classification." The automobile in question was owned by Ramsey and Barbee. Barbee, because of a reduced volume of partnership business, went to Virginia for work, obtained employment there, relinquishing his partner's salary in the Illinois firm, retaining his share of the profits, and he agreed to return to Auburn, Illinois whenever needed. He rented his Auburn home, obtained a Virginia residence, and he and Mrs. Barbee used the car in Virginia for general personal purposes. Mrs. Barbee while using the car with Barbee's consent, had an accident in Virginia with one Wendlinger. Wendlinger obtained a judgment against her, then sued Hardware to collect. The Court held the automobile was not covered by the policy, it was not being used in the insured's business, and it was not covered for pleasure purposes because not owned by the insured principally for use in connection

401

with the garage operations, it had been withdrawn from the operations of the business and was being used solely for Barbee's personal convenience not connected with the partnership business operations, and there should be a judgment for the defendant.

In Olson v. Standard Acc. Ins. Co. (1954) 211 F.2d 661, cited by Century, one Olson d/b/a Olson Implement Co. had an auto dealer and repair shop business, and he also d/b/a Terrazzo Tile Business had a terrazzo tile business wholly disconnected from the auto dealer and repair shop business. Standard Acc. Ins. Co. issued to Olson, d/b/a Olson Implement Company, a garage liability policy covering all his operations necessary or incidental to the auto dealer and repair shop business. Olson was operating a Ford truck owned by Johnson—Giere Motor Company, having said he wanted to buy it for the Terrazzo Tile business, but wanted to test it under load conditions, and on the day of the accident he had used it to deliver a load of marble to a job for the tile business and was returning therefrom when he had an accident with one Ahlgrim. Ahlgrim obtained a judgment against Olson. Olson sued the insurer to recover the judgment. The court held Olson was not using the truck at the time of the accident as a necessary or incidental part of the operation of the garage and implement business, but to determine the truck's fitness for use in the terrazzo tile business, and affirmed a judgment for the defendant.

In Employers Mut. Casualty Co. v. Federated Mut. Implement & Hardware Ins. Co. (1954) 213 F.2d 421, cited by Century, Henry Ulvick was president of Ulvick's, a corporation, in the business of farm implements and Chevrolet sales and with a garage and service departments. The corporation owned a 1951 Chevrolet, a demonstrator. Joanne Ulvick, Henry's daughter, entered a university, some 65 miles away.

With his permission she took that car for her personal use. She rendered no services for the corporation. One day when she was preparing to drive home for Christmas the car would not start. She called her father and he said he'd drive up and fix it. A corporation truck he intended to use for the trip would not operate, so Ulvick borrowed a personal car of one Lusty, assistant manager of the corporation. On the way to the city where his daughter was, Ulvick, driving the Lusty car, had an accident with Ostlie. Ostlie et al. sued Ulvick. Employers Mutual had issued to Lusty a policy on his car which normally would inure to Ulvick's benefit since he was using it with Lusty's permission, but it did not apply to such permissive user when that user was a person or organization or agent or employee thereof operating an automobile repair shop, or sales agency, "with respect to any accident arising out of the operation thereof." Federated Mutual had issued a garage liability policy to Ulvick's, the corporation, covering the use of any automobile "in connection with" the operations of the corporation's business, the use for "non-business purposes of any automobile . . . in charge of the named insured and used principally in the . . . operations," and the use "in connection with" the business operations of any automobile not owned or hired by the corporation. Federated etc. et al. brought a declaratory judgment suit against Employers etc. It was held that the collision did not arise out of the operation of the Lusty car in the garage operations of the corporation, nor out of any operation incidental thereto, the 1951 Chevrolet which Joanne Ulvick was using was not used at all in the corporation business, and the use by Ulvick of the Lusty car in going to its aid was not a use in connection with or incidental to the corporation's business, Mr. Ulvick's mission at the time was a purely personal one, and the Lusky car was not used princi-

pally in the corporation business. A judgment for the plaintiffs and against Employers was affirmed.

As will be seen, Aetna Casualty And Surety Co. v. Buckeye Union Casualty Co., supra, is the only one of the foregoing cases involving a temporary loan to and permissive user given temporarily to a customer, without charge, away from the premises, by a named insured automobile repair shop under a garage liability policy of an automobile while the customer's own automobile temporarily is being worked on at the shop. Apparently there, also, as here, at the particular time of the later accident the customer while so using the borrowed automobile was on a social or personal mission of his own. The trial court, Court of Appeals, and Supreme Court all concurred in holding that under the circumstances the temporary permissive use by the customer of the temporarily loaned automobile while his own car was being repaired was "in direct connection with such business operations" of the shop,—in furtherance of customer good will and satisfactory customer relationships,—that the garage liability policy covered the customer, and was primary, and the customer's own insurance on his own car, although applicable, was secondary. It is true the repair shop in that case owned the automobile which it loaned its customer, and it may be that under the language of that particular policy,—"while any such customer is using, for purposes of demonstration, or otherwise in direct connection with such business operations, any automobile covered,"—it would have applied only to automobiles so owned by the shop and used by a customer, although that feature is not particularly stressed in the opinion. But the principle thereof that the temporary permissive use by a customer, without charge, away from the premises, of an automobile temporarily loaned him by the shop while his own car is being there worked on may be "in direct connection with such busi-

404

ness operations" of the shop, notwithstanding that at the particular time of a later accident the customer is using the borrowed automobile on a social or personal mission of his own, is equally applicable where, as here, the loaned automobile is not owned by the shop, but is nevertheless in fact loaned, and permissive user in fact given the customer, the policy saying "use of *any* automobile in connection with the above defined operations." That is the closest case cited to the present case.

In each of the other above cases entirely different factual situations were involved, and in some the policy provisions were materially different. Though each would seem to be correctly decided, none, we believe are applicable to the case at bar.

The only Illinois cases referred to by the defendant Century are Yadro v. United States Fidelity and Guaranty Co. (1955) 4 Ill.App.2d 477, and Jones v. Manufacturer's Casualty Ins. Co. (1942) 313 Ill. App. 386. The first case involved a garage liability policy, and had to do with whether it covered damage by fire to a car left in charge of the named insured shop for servicing, and we believe it has no particular application here except as to some comments on well understood general principles of construction of insurance policies. The second case did not involve a garage liability policy but an automobile liability policy and the facts bear no resemblance to those of the present case. The vehicle insured was a commercial automobile, a farm truck, to be used "principally on or about the premises at the location stated in the policy and in connection with the operation of the named assured's farm,"—its purposes were commercial, the assured's occupation was farming, and "commercial" was defined, inter alia, as "uses incidental thereto, in connection with the named insured's business occupation." The assured one evening drove to a town, took some of his family

405

to a show at another town, and later after the show was driving to his son's home when an accident occurred. In a garnishment suit against the insurer it was held the use of the truck at the time of the collision was not within the coverage of the policy. Other than the language "in connection with the operation of the named assured's farm" and "in connection with the named assured's business occupation" the policy provisions bore no resemblance to those in the present garage liability policy. The case is somewhat typical of several others cited by Century here. They have to do with another rather extensive field of law which we cannot now examine into. However applicable they may be in other cases, they do not concern garage liability policies, or repair shops, or customers thereof, or cars loaned customers thereof. Their facts are wholly dissimilar from those here concerned, and we believe them not applicable in the present case.

██ We consider the foregoing material parts of the Century garage liability insurance policy to be reasonably clear. Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense; we do not believe the judgment, or our views, place a strained or unwarranted construction on the policy: Yadro v. United States Fidelity and Guaranty Co., supra; Jones v. Manufacturer's Casualty Ins. Co., supra; American Indemnity Co. v. Carney (1944) 54 F. Supp. 273. But, if there be believed, reasonably, to be any ambiguities the policy must, of course, be construed strictly against the insurer and liberally in favor of the party in the position of the insured.

██ So far as the judgment below involves matters of fact, it is not against the manifest weight of the evidence, and we are not at liberty to set it aside on

that basis: Jones v. Mfgs. Cas. Ins. Co., supra, and so far as it involves matters of law, we think it is correct. The judgment will, therefore, be affirmed.

Affirmed.

SOLFISBURG and WRIGHT, JJ., concur.